[No. C.D. 8190.   En Banc.   August 26, 1982.]

*In the Matter of the Disciplinary Proceeding*
*Against* ROBERT H. YAMAGIWA, *an*
*Attorney at Law.*

*Caroline D. Davis,* for Bar Association.

BRACHTENBACH, C.J.—In this case, respondent attorney Robert H. Yamagiwa transgressed a suspension order on a number of occasions and over an extended period of time. For this, he is disbarred.

Respondent Robert H. Yamagiwa, who practices law in Seattle, was suspended by this court on August 20, 1979, for failure to comply with APR 11, Continuing Legal Education (CLE) requirements. To date, nearly 3 years later, Yamagiwa has not certified that those requirements have been met.[1] Consequently, the suspension has never been lifted.

In 1981, a formal complaint was filed charging Yamagiwa with the violation of a number of the Discipline Rules for Attorneys. After a hearing at which respondent Yamagiwa was present and testified on his own behalf, the hearing panel officer found that the allegations had been proven and that Yamagiwa's conduct violated the following DRA provisions: (1) DRA 6.7(b) for failing to notify properly clients and attorneys for adverse parties of his suspension; (2) DRA 6.7(c) for acting as an attorney in a legal matter after entry of a suspension order; (3) DRA 1.1(i) for violating CPR DR 1–102(A)(4) which prohibits conduct involving dishonesty, fraud, deceit or misrepresentation; (4) DRA 2.6 for failure to cooperate in the bar association's investigation of the disciplinary complaints against him; and (5) DRA 1.1(j) for both the willful violation of DRA 2.6 and the willful disregard of a subpoena of state bar counsel. As all these violations took place while Yamagiwa was suspended from practice, the hearing panel officer recommended that respondent be disbarred.

---

[1]Respondent Yamagiwa testified at the hearing on April 29, 1981, that he had completed his CLE requirements at that time, but had not turned in his certificate. Subsequently, in a letter dated June 6, 1981, respondent promised that his affidavit of compliance with the CLE requirements would be forthcoming within a week. No such certification has been received, thus casting doubt on the veracity of his statements.

After considering the transcript of the hearing, as well as the statements in opposition and support of the hearing panel officer's findings filed by Mr. Yamagiwa and bar counsel respectively, the Disciplinary Board of the Washington State Bar Association unanimously adopted the findings, conclusions, and recommendation of the hearing panel officer. The Disciplinary Board added its own recommendation that Mr. Yamagiwa be disbarred.

This court reviews any order by the Disciplinary Board which recommends suspension or disbarment. DRA 6. Respondent Yamagiwa received notice of this review, but he filed no objections to the Board's recommendation. He filed no brief. He did not appear at the hearing before this court. In light of this inaction, one might assume that Mr. Yamagiwa does not wish to contest the Board's recommendation. Nonetheless, we have reviewed the record to ascertain whether the findings, conclusions and recommendation of the Board are supported by the evidence. We find that they are, and conclude that disbarment is the appropriate sanction in this instance.

I

DRA 6.7(a) requires that a disbarred or suspended attorney

> promptly notify by registered or certified mail, return receipt requested, all clients being represented in pending matters . . . of his or her disbarment or suspension and his or her consequent inability to act as an attorney . . . and shall advise said clients to seek legal advice elsewhere.

Mr. Yamagiwa admits that he did not send such letters to his clients when he was suspended. He would have us believe, however, that because he transferred his divorce cases to the other attorneys in his office and continued to represent only clients with immigration issues, he is somehow exempt from this notice requirement. Such is not the case. The rule is unequivocal. It is imperative both to protect the public and to preserve the dignity of the profession that clients be informed when an attorney is suspended and

consequently lacks the authority to represent or advise them in legal matters. To ignore such a mandate is conduct unbefitting a professional.

DRA 6.7 is equally applicable to those who are suspended for failure to comply with CLE requirements as to those suspended for other reasons. This court is committed to a program of continuing education for attorneys, so that they might remain abreast of recent decisions and trends in the law and continue to develop their legal skills. At present, the requirement is only 15 credit hours per year. APR 11.2(a). If an attorney fails to meet the 15–hour requirement within the calendar year, he or she is automatically given another 4 months to make up the deficiency. APR 11.6(a). Moreover, before any disciplinary action is taken, the Board sends a written notice to the noncomplying attorney so he or she might petition for an extension of time to complete the requirements. It is only after this extended opportunity to comply has lapsed that disciplinary actions are initiated. There is no record indicating that Mr. Yamagiwa either petitioned for an extension of time or complied with the CLE requirements during the more than 8–month hiatus between the time he was required to have completed his 1978 CLE requirements and the date he was suspended.

Moreover, the basis for Mr. Yamagiwa's suspension is immaterial to our decision today. The sole issue before us is the proper disciplinary sanction for one who violates a suspension order.[2]

## II

Mr. Yamagiwa's professional conduct changed very little after he was suspended. He merely refrained from using legal letterhead and changed the way the phone was

---

[2]The dissent attacks the CLE requirements and the sanctions imposed for violation thereof. Such arguments might have been pertinent at the time the suspension order was entered by this court, or they may serve to initiate a movement to change the rules in the future, but they are not germane to the issue presently before us.

answered; however, he did not notify his clients of his suspension and continued to represent them before the Immigration Service.

Mr. Yamagiwa contends that his activities before the Immigration Service did not constitute the practice of law. DRA 6.7(c) requires, however, that a suspended attorney "not accept any new retainer or engage as attorney for another *in any case or legal matter of any nature.*" (Italics ours.) There is no doubt that immigration is a legal matter and that Mr. Yamagiwa necessarily drew from his knowledge of the law in advising and assisting his clients. In light of the fact that his clients were not notified of his restricted role, Mr. Yamagiwa's fine distinction between legal and immigration matters is indefensible.[3]

### III

Other facts show that respondent engaged in conduct involving deceit or misrepresentation, thus violating CPR DR 1–102(A)(4) and DRA 1.1(i).

In September 1980, a year after being suspended, Mr. Yamagiwa assisted a client named Gustavo Schagen in an immigration matter and also advised him on a misdemeanor theft charge. Respondent provided Mrs. Schagen with his professional card which read "Robert H. Yamagiwa, Attorney at Law." Understandably, Mr. Schagen believed that respondent was an attorney and was representing him as such in both the immigration matter and the criminal case. Mr. Yamagiwa proceeded to act as an attorney and negotiated with the prosecutor handling Mr. Schagen's case for a stipulation to stay prosecution. Mr. Yamagiwa billed Mr. Schagen for his services. He failed, however, to follow the case through or to return Mr. Scha-

---

[3]Whether or not this conduct is tantamount to the unauthorized practice of law is a question that is not before us. Had Mr. Yamagiwa's clients been properly notified of his suspended status and chosen him nonetheless to assist them in a limited capacity in immigration matters, and had the Immigration Service understood that his role was so limited, the situation might be different. However, such is not the case before us.

gen's numerous phone calls. Consequently, Mr. Schagen missed his court date and was forced to consult another attorney to have the stipulation properly entered.

Mr. Ayres, the prosecuting attorney, was also given the impression that Mr. Yamagiwa was a practicing attorney. Mr. Yamagiwa initiated two calls to Mr. Ayres to explain Mr. Schagen's situation to him and convince him that a stay of proceedings would be proper under the circumstances. Mr. Yamagiwa mentioned that he would not be representing Mr. Schagen in court, but he did not mention that he was suspended from the practice of law. Under these circumstances, it was logical for the prosecutor to assume that Mr. Yamagiwa was acting as an attorney, and it was deceitful for respondent not to tell him otherwise. *See* CPR DR 1–102(A)(4). When suspended, an attorney must notify the attorney for an adverse party of his suspended status. *See* DRA 6.7(b). Nothing less is expected of one in a continuing, suspended state.

Mr. Yamagiwa also misrepresented himself as an attorney in good standing on other occasions. In September 1979, while suspended, Mr. Yamagiwa took on a new client, represented her before the Immigration Service, then sent her a letter requesting $500 in *attorney's fees*. In November 1979, Mr. Yamagiwa requested from another potential client payment of $1,000 in attorney's fees, designated as a nonrefundable retainer. Also, in June 1980, Mr. Yamagiwa reviewed some documents prepared by an attorney in Oregon, and was paid for this service by a letter addressed to him as an attorney at law. Obviously, each of these individuals understood that Mr. Yamagiwa was an attorney in good standing when employing his services. These facts indicate that Mr. Yamagiwa overtly and covertly misrepresented himself as an attorney and deceived others regarding his status. Such conduct is a clear violation of the standard of conduct expected of those licensed to practice law. CPR DR 1–102(A)(4); CPR DR 3–101(B); DRA 1.1(i).

## IV

Finally, the Board's conclusions that Mr. Yamagiwa failed to cooperate in the bar association's investigation, and willfully disregarded a subpoena of the state bar counsel are also substantiated by the facts.

Respondent Yamagiwa received three letters from the bar association requesting a response to a disciplinary complaint concerning his practice during suspension. These letters were sent May 7, 1980; June 9, 1980; and June 23, 1980. No response from these letters had been received by July 1980, when respondent was served with a subpoena duces tecum and a notice of deposition. Although respondent was personally served, he failed to appear at the deposition.

A second disciplinary complaint against respondent was filed with the bar association in December 1980. Letters dated December 15, 1980; January 19, 1981; February 2, 1981; March 6, 1981; April 14, 1981; and April 16, 1981, were sent to respondent requesting a response. As of the date of the hearing, April 29, 1981, no written response to the complaint had been submitted.

DRA 2.6 states:

It shall be the duty and the obligation of an attorney who is the subject of a disciplinary investigation to cooperate with the Local Administrative Committee, State Bar Counsel or bar staff as requested, subject only to the proper exercise of his privilege against self–incrimination where applicable, by:

(a) Furnishing any papers or documents;

(b) Furnishing in writing a full and complete explanation covering the matter contained in such complaint; and

(c) Appearing before the Committee at the time and place designated.

Such requirements are necessary to enable the bar association to efficiently and effectively investigate complaints of attorney misconduct. Here, Yamagiwa failed to respond in a timely manner to any of the nine letters from the bar. His belated response to the first complaint, 3 months after the

first letter was sent, postdated his failure to appear at his deposition. With reference to his deposition, Yamagiwa admitted that he was served with the subpoena, but claimed that he did not look at it at the time. He stated that "[s]everal days or a week or two after receipt, I looked at it and discovered the date had passed for the subpoena or the appearance."

Respondent Yamagiwa's defense has been that emotional and physical problems prevented him from cooperating with the bar. Obviously, the strength of such a defense depends primarily on the credibility and sincerity attributed to respondent's testimony. Apparently, such excuses were not persuasive to the hearing panel officer, for, after hearing the testimony, he found that Yamagiwa had willfully violated DRA 2.6 and willfully disregarded the subpoena. *See* DRA 1.1(j). On this issue, we give credit to the triers of fact because they see and hear the witnesses and are thereby better able to weigh the evidence given and consider the credibility of the various witnesses. *Peterson v. Department of Labor & Indus.*, 22 Wn.2d 647, 652, 157 P.2d 298 (1945).

The undisputed facts are that Yamagiwa, after he was suspended, failed to properly notify his clients of his suspension; gave his professional card, which stated he was an attorney, to a client; opened a new case and represented a client for which he charged "attorney fees;" and misled a number of clients and attorneys as to his status as an attorney in good standing. He also failed to respond to nine bar letters and failed to appear at his deposition in violation of a subpoena. These facts are sufficient to support the Board's findings that Yamagiwa violated the disciplinary rules discussed above.

## V

We turn now to the question of the appropriate sanction to impose. Both the hearing panel officer and the Disciplinary Board recommended disbarment. These recommendations are given serious consideration by this court,

*In re Krogh,* 85 Wn.2d 462, 536 P.2d 578 (1975), and we agree that disbarment is warranted by the facts of this case.

█ The primary purposes of disciplinary sanctions are to protect the public and to preserve confidence in the legal profession and judicial system. *In re McNerthney,* 95 Wn.2d 38, 41, 621 P.2d 731 (1980). Yamagiwa's transgressions seriously undermine both these premises. For example, Mr. Schagen thought Mr. Yamagiwa was an attorney and was representing him in his defense of criminal charges. As a result of Mr. Yamagiwa's misrepresentation of his status and his inaction, Mr. Schagen missed a court date, was verbally reprimanded by the judge, and was forced to hire another attorney. Moreover, as Mr. Yamagiwa failed to notify his clients of his suspension, it is unknown how many immigration clients were injured by their mistaken perception that Mr. Yamagiwa was providing them the full services of an attorney in good standing. Such deceptions have the continuing potential for injury to the public and necessarily tarnish the public's view of the legal profession.

█ In determining the correct sanction to impose, we have previously outlined five factors to be considered: (1) the seriousness and circumstances of the offense; (2) avoidance of repetition; (3) deterrent effect upon others; (4) maintenance of respect for the honor and dignity of the legal profession; and (5) assurance that those who seek legal services will be insulated from unprofessional conduct. *In re Kumbera,* 91 Wn.2d 401, 588 P.2d 1167 (1979). All these factors support our decision to disbar respondent.

Disregard of a suspension order is a serious offense. Here, respondent's failure to notify his clients demonstrates an initial disregard which was magnified by his subsequent misrepresentations. Also, we find his actions to be especially onerous because of the extended period of time over which they took place.

As Mr. Yamagiwa was already suspended at the time of these offenses, disbarment appears to be the only insurance against repetition. Such a severe sanction will also serve an

important function of deterring others from violating a suspension sanction. Finally, one who misleads clients and attorneys as to his status as an attorney must be sanctioned to maintain respect for the legal profession and to protect the public from such unprofessional conduct. Thus, all these factors support the severe sanction of disbarment.

While we consider mitigating factors such as restitution, repentance and temporary personal disability in determining the proper discipline to impose (*In re Kumbera, supra*), such factors do not alter our conclusion here. Mr. Yamagiwa's emotional and physical problems can only partially excuse his failure to cooperate with the bar. He received letters requesting a response beginning in May 1980, but he did not even respond with a phone call until 3 months later. Also, his failure to appear for his deposition is, by itself, evidence of conduct unbefitting an attorney. But most importantly, these personal problems in no way excuse respondent's failure to notify his clients of his suspension and his misrepresentations of his status to clients and other attorneys. Respondent chose to misrepresent himself as an attorney and to engage in legal matters while suspended; for this he is disbarred.

The name of attorney Robert H. Yamagiwa shall be stricken from the roll of attorneys in this state. Costs of $450.76 are approved.

STAFFORD, UTTER, DOLLIVER, DIMMICK, and PEARSON, JJ., concur.

WILLIAMS, J. (concurring)—Despite what seem to be overwhelming facts against Mr. Yamagiwa, I am troubled by the disposition of this case. It is indeed a tragedy that what began as a suspension for merely failing to maintain continuing legal educational requirements has now "snowballed" to the point where we must disbar Mr. Yamagiwa. I have to believe that this court has not been fully informed of Mr. Yamagiwa's reasons for failing to maintain CLE credits and for failing to cooperate with the bar association

in these proceedings. The task of disbarring this attorney would be much less troubling to me if I felt I knew all the facts regarding Mr. Yamagiwa's physical and mental condition. Unfortunately, we do not have such information before us.

The fact remains, however, that Mr. Yamagiwa disregarded an order of suspension of this court. If any remedial measure short of disbarment would suffice until we could ascertain what prompted Mr. Yamagiwa to take the course of action he did, I would order it. Under the facts of this case, however, the attorney made no effort to defend himself or explain his conduct to this court. Because it is my belief that no alternative sanction exists here, I concur in the opinion of the majority ordering Robert H. Yamagiwa's disbarment.

PEARSON, J., concurs with WILLIAMS, J.

DORE, J. (dissenting)—This is a disciplinary case of first impression. It involves the disbarment of an attorney who failed to secure his necessary CLE credits during 1978, was suspended, and by the majority opinion will be disbarred for violations of the Discipline Rules for Attorneys that occurred during his suspension. As every lawyer in the state has the obligation to satisfy the Continuing Legal Education (CLE) requirements, this case is important to the entire profession. The CLE program has been a tremendous aid in keeping attorneys apprised of recent decisions and techniques in the practice of law. Like any successful program, however, there are weaknesses. In recent years, the bar has delegated to third parties the right to hold these seminars for CLE credits. They have conducted seminars on some subjects that, frankly, have not been too helpful to the average practitioner. Some groups conducting such CLE seminars charge high, if not excessive, tuition for attendance. I received a notice the other day that one would be given in Seattle. The tuition charge for a 2–day session was $35 another was $100 for a 1–day session. I wonder

whether some of our less affluent practitioners and young lawyers can afford to pay these high charges in order to continue to be eligible to practice law.

Yamagiwa has become the first disbarment victim of our CLE reform system. I always thought disbarment was an extreme penalty to be used only against the lawyer who would do a dastardly act involving moral turpitude wherein any fair-minded lawyer would agree that such individual should be thrown out of the profession. I don't believe that Yamagiwa meets that test.

### FACTS

Robert H. Yamagiwa was admitted to the practice of law in the state of Washington on October 18, 1973. He has never had any previous bar association complaints filed against him. At the time of his hearing, he had completed his CLE requirements but had not filed a certificate of completion with the bar association. Yamagiwa's office was on the second floor of a building located on Jackson Street in Pioneer Square in downtown Seattle. The sign listing the names of three attorneys was outside the building and it was necessary to walk up a flight of stairs to get to the individual law offices. When entering the office there were no names on the door but only a number. After suspension from the practice on August 20, 1979, Yamagiwa so advised his associates and they changed the method of answering the phone from saying "law offices" to reciting the phone number. From that date forward, he did not use letterhead stating he was a lawyer.

Yamagiwa testified that the vast majority of his cases were matters pending or going before the Immigration Service for visa applications; the others were divorces. He testified he transferred his divorce cases to his associates. He then contacted the deputy director of the Immigration Service, advised him of his suspension and asked whether he would be able to represent people before the Immigration Service without being a lawyer. The deputy director stated that he could continue to appear before the Immi-

gration Service. According to testimony in the record, one need not be an attorney to represent people before the Immigration Service except on deportation matters. Yamagiwa's immigration services consisted of filing of visa petitions and sitting in on visa and investigative interviews. Bar counsel advised the hearing officer that the bar association did *not* contend that Yamagiwa's practice before the Immigration Service was the practice of law.

One of the charges against Mr. Yamagiwa was that he shared his office with two other attorneys and led them to believe that he was entitled to practice law. One of those attorneys, Rodney L. Kawakami, filed an affidavit in which he stated:

"I was aware that Mr. Yamagiwa had been suspended from the practice of law in the fall of 1979 for failure to meet his CLE requirements. It was my understanding that Mr. Yamagiwa was taking the proper steps to become reinstated. Sometime after Mr. Yamagiwa's suspension, *Mr. Mamiya contacted the Bar Association and was advised that Mr. Yamagiwa was a member of the Bar in good standing.* Based on this information from the Bar, it was then my assumption that Mr. Yamagiwa had taken his CLE credits or had otherwise satisfied this requirement and had only to be formally reinstated.

(Italics mine.)

There is not a scintilla of evidence that Yamagiwa had led his office associates to believe that he was entitled to practice law. In fact, on the contrary, they inquired themselves and were advised by the bar association that Yamagiwa was a member of the bar in good standing.

Another charge was that Yamagiwa took on new cases and assisted new clients after the date of suspension. In order to prove this charge, the bar association called Richard Ayres, an attorney from Friday Harbor, who was working as deputy prosecuting attorney in Friday Harbor from January 1979 through December 1980. One of Yamagiwa's immigration clients, Schagen, was charged by the deputy sheriff of Orcas Island of stealing two or three pieces of firewood from the Rosario resort. Prosecutor Ayres testified

in part as follows:

> Q. At that time, what was your understanding of Mr. Yamagiwa's status in regard to Mr. Schagen?
>
> A. There is something that Mr. Yamagiwa told me, *like I told you over the telephone* I'm a little concerned about. My recollection is that he stated that *he wasn't actually going to represent him in any kind of misdemeanor trial if there were to be one and that sort of thing, but he was inquiring and just trying to help him out down here if anything could be done.* That's my recollection of it. I believe he stated something about—I remember him saying that he was *basically involved, I think, in immigration* or helping aliens, that sort of thing with their status. That was really just about it to my recollection.

(Italics mine.)

The bar's finding that "Yamagiwa represented an individual named Schagen on a criminal matter who was charged with a misdemeanor theft charge in San Juan County" is not only lacking in supporting evidence, but was *proved to the contrary.*

The stipulation that Ayres sent was never returned and Schagen related that he hired another lawyer in Friday Harbor, and the second lawyer prepared another stipulation that settled the criminal matter.

In addition to Schagen's testimony, bar counsel subpoenaed four other files which she claimed were new cases secured by Yamagiwa during his suspension period.

1. The first one was labeled "Askew". Bar counsel introduced into evidence a letter dated November 8, 1979, requesting payment of a $2,000 attorney's fee. Yamagiwa denied that the services were rendered during his suspension and testified: "If I may, the letter addressed to Mr. Askew is dated November 8, 1979. There was no case to take on." Apparently this fee was for services rendered prior to his suspension.

2. The second file was labeled "Rana". On June 16, 1980, in response to a request from an attorney in Eugene, Oregon, Yamagiwa was asked to review an application for a

labor certification that a Mr. Wu was preparing for one of his clients. This matter involved an Oregon attorney and an Oregon client, and the retention of the attorney was in Oregon. There's no indication whether it involved an immigration or legal matter requiring a bar license, and there is no evidence that Yamagiwa reviewed the certification as a layman or as an attorney.

3. The third file was labeled "Sibolodoro". Apparently the bar examiner was under the impression the file was opened subsequent to Yamagiwa's suspension for assistance in an adoption matter. However, Yamagiwa negated the charge by testifying:

A. The file was opened to assist Mrs. Sibolodoro in obtaining a visa for her adopted child in the Phillipines [*sic*].
Q. The child was already adopted at that time?
A. Yes.

4. The fourth file was captioned "Senevirante". As part of that file, Yamagiwa directed a letter, under date of September 14, 1979, to a Miss Fuentes requesting attorney's fee in the amount of $500. In the testimony, it developed that this fee was requested for representation before the Immigration Service, not on a legal case.

Reading the testimony, I can only conclude that the four so-called incriminating files against Yamagiwa were not incriminating.

The record shows that on December 15, 1980, bar association staff attorney Caroline Davis wrote Yamagiwa (exhibit 9) concerning a complaint of Dan P. Danilov, an attorney who also specializes in immigration matters. On January 19, 1981, a second letter was initiated by Ms. Davis (exhibit 10) asking Mr. Yamagiwa to respond to the complaint of Mr. Danilov. On February 2, 1981, a third letter was sent (exhibit 11), again requesting a response to Mr. Danilov's letter. On April 14, 1981, a fourth letter was sent to Yamagiwa asking a response to the complaint of Mr. Danilov. In such letter (exhibit 12), Ms. Davis stated: "To date I have received no response to this letter. This is the

fourth letter I have sent you concerning the complaint of Mr. Danilov".

When Yamagiwa was examined by the bar counsel, he stated he had never received the December 15, 1980, letter which was the first letter concerning the complaint of Danilov. He admitted he received the January 19, 1981, letter but explained that he didn't answer it because in the latter part of January or the early part of February he was involved in an accident and was hospitalized, and upon recuperation from that "I threw my back out again". He stated he was in the hospital 5 or 6 days. He denied that he received the letter of February 2, 1981. He denied that he received the letter of April 14 also regarding Mr. Danilov's complaint. When asked why he didn't pick up his certified letters at the post office, he answered:

> It was difficult for me to get to the post office.[4] I received a notice and on a couple of occasions I would try to have people go pick it up. One person came back and said the line was so long on that particular day and I told them, well, we would try again some other particular time.

The bar association contends that Yamagiwa *willfully* disregarded a subpoena to take his deposition. He testified that he intended to appear but, through neglect, overlooked the date. He then called the bar office and rescheduled the same, and appeared. The bar made no attempt to dispute this testimony which clearly shows that Yamagiwa's actions were not *willful*.

Pursuant to DRA 6.7(b), Yamagiwa had an obligation to advise his clients of his suspension. He transferred all his divorce cases to other attorneys. His immigration practice could be performed by a layman, so there is some question in my mind whether notification would have served any useful purpose, or whether there was a violation of DRA 6.7(b) in failing to notify such clients under these circum-

---

[4]Yamagiwa testified that, since the accident up to the time of the hearing, he had been physically disabled and had been only able to work approximately 10 hours a week.

stances. If he was going to continue to represent clients before the Immigration Service, why would he have to advise them that he could not represent them during his suspension?

## SUMMARY

In my opinion, evidence in the record established that Yamagiwa was guilty of the following charges:

1. That, after suspension, he failed to remove his name from a sign located at the street–level entrance at 671 South Jackson Street which listed Yamagiwa as a lawyer sharing office space with two other lawyers.

2. That he failed to respond within a reasonable time to three letters from the bar association requesting a response to a disciplinary complaint in regard to his practicing during suspension. He also failed to timely respond to bar association letters regarding the complaints of Dan Danilov.

3. That he failed to advise his clients in writing that he had been suspended.

The record also established that Yamagiwa was not guilty of the following charges:

1. Taking on new law cases and clients after the date of suspension and requesting "attorney fees" from these clients for legal work performed while suspended.

2. Representing, during his suspension, that he was an attorney.

3. Representing Schagen on a criminal case.

4. Violating DRA 1.1(j) (*willful* disregard of a subpoena of bar counsel).

## CONCLUSION

A simple failure to timely secure necessary CLE credits ends in disbarment. This is a tragedy.

The bar's letter of May 7, 1980, directed to Yamagiwa, advised of a complaint that he was practicing law before the Immigration Service while he was suspended. The record established that Yamagiwa's representation of clients on immigration matters was not the practice of law. A simple response at that time by Yamagiwa would have

ended the matter. Unfortunately, he was emotionally disturbed during this period as his stepson was missing. Later he was involved in an accident, injuring his back, which further complicated matters.

Under our rules, if a lawyer fails to fulfill his CLE requirements by May 1 of the year following the year in which he failed to secure the necessary credits, the Board of Governors, at their discretion, may put such a lawyer on the inactive list, conditionally remove his name from the active list, or recommend suspension to the Supreme Court.[5] Everyone is not treated the same. Would the Board of Governors recommend disbarment of a lawyer on the inactive list if he took on a few new clients?

I raise these issues because I believe the time has come to provide uniform disciplinary rules for all lawyers who fail in their CLE requirements. Secondly, specific penalties should be provided for those who are guilty of additional violations while under suspension for failure to meet CLE requirements. Such penalties should be substantially less severe than penalties imposed upon those who have their licenses suspended for other reasons.

The majority says, "He did not appear at the hearing before this court. From this inaction we can only assume that Mr. Yamagiwa does not wish to contest the Board's order". The record showed he contacted an appellate attorney who called our clerk's office, but decided not to appear on Yamagiwa's behalf. Apparently Yamagiwa couldn't afford to pay an attorney's fee on appeal.

At the bar hearing, he defended himself quite ably, denying many charges, but readily admitting his violations with simple candor. I am satisfied that the injuries he received in an accident, his continued poor health and the emotional stress caused by the disappearance of his stepson were mitigating circumstances that the bar examiner and the bar association have overlooked.

I believe that, on this record, disbarment for Yamagiwa is

---

[5]Admission to Practice Rule 11.

much too severe. I would suspend Yamagiwa's license for 3 months, retroactive to the date of the disciplinary hearing.

ROSELLINI, J., concurs with DORE, J.